U.S. DISTRICT COURT
Southern District of GA
Filed In Office

M

11 21 20 S

**Deputy Clerk**

JULIET D. KEARSE, )
)
Plaintiff, )
)
v. ) CASE NO. CV413-089
)
THE MAYOR AND ALDERMEN OF THE )
CITY OF SAVANNAH, GEORGIA, )
)
Defendant. )
)

## O R D E R

Before the Court is Defendant The Mayor and Aldermen of the City of Savannah's Motion for Summary Judgment. (Doc. 37.) For the following reasons, Defendant's motion is **GRANTED**.

### BACKGROUND

In this case, Plaintiff Juliet D. Kearse claims that Defendant discriminated against her when it terminated her employment.[1] Plaintiff worked as a drinking water laboratory analyst for Defendant from November 13, 2006 until February 23, 2011. (Doc. 37, Attach. 1 at 4-5.) Per Plaintiff, the job of drinking water laboratory analyst involved a lot of heavy lifting. (Id. at 5-6.) At the time, there were two

---

[1] For the purposes of ruling on Defendant's Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

other lab analysts and the three lab analysts would take turns working in different sections. (Id. at 6.) One analyst would run the microbiology section, one would run the spectro station, and one would work in titration and then the three analysts would rotate to another section. (Id.) It was important for the analysts to switch around to the other stations. (Id.) The microbiology section "was the really heavy section" where the analyst had to check for chloroform, chlorine residual, bacteria, and other items. (Id. at 5-6.) This section would entail lifting pans of samples, containing forty to fifty bottles of water. (Id.) The titration section also included lifting "a lot of" liter bottles, whereas the spectro station "wasn't really heavy except for the liter bottles we had to lift." (Id.) The lab analysts' job also included driving to different sections of Savannah to test water every week and lifting and loading the water samples into the vehicle. (Id. at 5.)

On February 25, 2010, Plaintiff discovered a ganglion cyst on her left hand between her wrist and middle finger. (Id. at 12.) Before February 25, 2010, Plaintiff was having problems trying to lift and, when lifting heavy pans into the micro section before the cysts appeared, she felt pain and pulling in her left hand. (Id. at 12; 13.) Plaintiff saw Dr. Stephen Pohl at Immediate Med as a part of the

workers' compensation process and understood from him that a ganglion cyst develops through repetitive motion. (Id. at 13.) Dr. Pohl referred Plaintiff to Dr. William Kropp, who removed the cyst during surgery on March 31, 2010. (Id.) Plaintiff was off work for nearly two months after the surgery and returned to work with light duty restrictions from Dr. Kropp, which Defendant accommodated. (Id.) During the light duty period, Plaintiff did not do any sample preparation–rather, she entered laboratory data in a database, typing with one hand. (Doc. 37, Attach. 2 at 11.) As a result of Plaintiff being placed on light duty work, the rest of the staff had to cover Plaintiff's lab analyst work. (Id.) Dr. Kropp released Plaintiff to return to work without restrictions in October 2010 and discharged her from his care. (Doc. 37, Attach. 1 at 16.)

Plaintiff complained to Dr. Kropp of pain in her neck, arm, and hand, and she understood that he thought she might have a pinched nerve. (Id. at 16.) He sent her to Dr. H. Clark Deriso in October 2010 and Plaintiff understood that Dr. Deriso thought she might have a pinched nerve. (Id.) On November 2, 2010, Plaintiff went to the Candler Hospital emergency room and requested a couple of days off from work and a referral to a neurological doctor. (Id. at 17.) Plaintiff received an excuse for two days off and a

referral to Dr. E. Frank Lafranchise of Savannah Neurology Specialists. (Id.) Plaintiff saw Dr. Lafranchise on November 5, 2010 and an EMG nerve conduction test was done on November 16, 2010. (Id.) Plaintiff received a copy of the EMG report of Julia Mikell, M.D., which stated that the nerve conduction studies and needle examination were normal, and "there [was] no EMG evidence of neuropathy or cervical radiculopathy." (Id. at 17-18.) Plaintiff testified that she recalled finding out in November of 2010 that the results of the EMG were normal. (Id. at 18.) Plaintiff obtained a medical excuse from Dr. Mikell, which Plaintiff gave to Defendant, verifying that Plaintiff had been seen on November 16, 2010 and could return to work with no restrictions on November 17, 2010. (Id.)

On November 30, 2010, Plaintiff saw Wallette Widener, APRN, at Savannah Neurology Specialists. (Id.) Ms. Widener discussed with her the results of the EMG and MRI as well as the fact that Plaintiff could return to work but was advised to avoid operating heavy equipment or lifting any heavy objects until she has completed physical therapy. (Id.) The only report which Plaintiff provided Defendant from this visit was a return to work status form dated November 30, 2010, listing a diagnosis of neck pain, and restricting Plaintiff from lifting and "while attending PT

4

(physical therapy) no driving heavy equipment." (Id. at 19.) The return to work form did not restrict Plaintiff from heavy lifting, it restricted her from lifting. (Id.) Plaintiff admits that lifting and operating heavy equipment are essential functions of her job as a lab analyst. (Id.) After Defendant received these restrictions, Plaintiff was put back on data entry for a brief period of time. (Doc. 37, Attach. 2 at 13.) Defendant also sought to place Plaintiff back into the regular working schedule, limiting the lifting as much as possible. (Id.) Plaintiff continued to say she was not able to perform the duties in that she could not pick up things, she could not lift things, and she could not hold things. (Id.) Plaintiff was asked a couple of times by Mr. Tony Tucker, the laboratory manager, to provide additional information as to the scope of her restrictions. (Doc. 37, Attach. 1 at 20.) In response, Plaintiff told her employer that they could contact her doctor with any questions. (Id.)

Plaintiff signed a request for FMLA leave and leave was granted effective January 18, 2011. (Id. at 20; 22.) Plaintiff felt that Defendant forced her to sign the FMLA documents and take her remaining leave. (Id.) Plaintiff had previously requested FMLA leave by way of a form dated March 30, 2010 and had used FMLA leave during her workers'

compensation leave. (Id. at 28.) On February 8, 2011, Plaintiff was evaluated by Fremont Wirth, M.D. of the Neurological Institute of Savannah as an independent medical examination in her workers' compensation action involving Defendant. (Id. at 23.) In the independent medical evaluation, Dr. Wirth found that Plaintiff's "current level of functional activity appears normal. Her subjective complaints are not substantiated by objective findings and restriction of activities cannot be substantiated." (Id. at 48.) Dr. Wirth also noted that, after reviewing a MRI done at St. Joseph's Hospital, "[t]he changes are minimal degenerative changes and are not unusual in a 44 year old person." (Id. at 51.)

According to Plaintiff, she suggested to Heath Lloyd, the then Water Supply and Treatment Director for Defendant, that she be transferred to the office downtown that works with the water part of public works, or the wastewater laboratory. (Doc. 37, Attach. 1 at 25.) Before her injury in February of 2010, she had applied more than once to work at the wastewater laboratory. (Id.) She made inquiries to Lloyd about transfers, however, Plaintiff does not recall ever applying to an open position after February 25, 2010 or specifically requesting to be transferred to an open position. (Id. at 26.)

Plaintiff admits that Defendant has shown that she was permitted, and did in fact take, her 12 weeks of FMLA leave. (Id. at 28.) Plaintiff received a letter from Rebecca Copeland dated January 14, 2011 indicating that since Plaintiff began to use FMLA benefits on March 21, 2010, as of January 14, 2011, Plaintiff had 3.7 weeks of FMLA benefits remaining. (Id.) Plaintiff next received a letter from Ms. Copeland dated January 31, 2011, indicating, among other things, that Plaintiff's FMLA benefit was approved from January 18, 2011 through February 13, 2011, and that her FMLA balance ended on February 13, 2011. (Id. at 28-29.) Plaintiff did not return to work. She filled out a request for special leave without pay for "personal leave" beginning February 14, 2011, the day after her FMLA leave ran out, but this leave was disapproved. (Id. at 29.) Plaintiff did not state that she could have performed all of the essential functions of the job as of the day she requested leave without pay, rather, Plaintiff was under the belief that she was supposed to stay under the restrictions until Dr. Lafranchise saw her again, which had not occurred as of the date of Plaintiff's deposition. (Id.)

Plaintiff obtained an FMLA Certification of Health Care Provider form from Dr. Kropp on February 14, 2011 but

did not see Dr. Kropp in obtaining this form. (Id. at 30;
32.) The form states that Plaintiff was unable to perform
the essential function of the job of repetitive movement.
(Id. at 30; 54.) Plaintiff states that she does not know
whether this statement on the form related to the date of
signing the form, February 11, 2011, or to the date that he
was treating Plaintiff before she was released to work
without restrictions in 2010. (Id. at 32.) However,
Plaintiff stated that Dr. Kropp was supposed to be signing
the form "for [her] to go back to work." (Id.)

Plaintiff was terminated on February 23, 2011. (Doc.
37, Attach. 2 at 19.) Plaintiff was terminated because she
was unable to perform the job duties and had no leave left.
(Id. at 16.) Per Lloyd, Plaintiff had exhausted all leave,
and "the process for the organization is if you do not have
time, i.e., leave, vacation, leave without pay" then
"separation from work is the next part of the process."
(Doc. 37, Attach. 3 at 3, 19.) On May 5, 2011, Plaintiff
filed a charge of discrimination with the United States
Equal Employment Opportunity Commission ("EEOC") dated
March 24, 2011. (Doc. 37, Attach. 1 at 30.) After receiving
the Notice of Right to Sue, Plaintiff filed an action in
Chatham County State Court on February 25, 2013. (Doc. 1 at
15.) The state court action was dismissed without prejudice

on April 1, 2013, after which Plaintiff filed this action on April 11, 2013. (Id. at 1.) In her complaint, Plaintiff brings claims for discrimination, retaliation, and interference under the ADA and claims for interference and retaliation in violation of the FMLA. (Id. at 9-11.)

In Defendant's Motion for Summary Judgment, Defendant argues that Plaintiff's FMLA claims are barred by the two-year statute of limitations. Defendant further argues that, even if Plaintiff's FMLA claims are not barred, the claims nevertheless fail because Plaintiff received twelve weeks of FMLA leave and, therefore, no FMLA right was interfered with and Plaintiff is unable to show that Defendant's legitimate, non-retaliatory reasons for terminating Plaintiff were pretext for retaliating against Plaintiff. (Doc. 37 at 12-16.) In regards to Plaintiff's ADA claims, Defendant contends that Plaintiff was not a qualified individual under the ADA. (Id. at 17-22.) Defendant also argues that Plaintiff's ADA retaliation claim must be dismissed because Plaintiff failed to exhaust her administrative remedies before the EEOC, because the retaliation claim is duplicative of the discrimination claim, and because Plaintiff has failed to rebut Defendant's legitimate, non-retaliatory reason for terminating Plaintiff. (Id. at 20-25.) In the event that

the ADA retaliation claim survives, Defendant argues that any claim for monetary damages must be dismissed. (Id. at 25.)

## ANALYSIS

I.  SUMMARY JUDGMENT STANDARD

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is

essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one

11

inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." <u>Barfield v. Brierton</u>, 883 F.2d 923, 933-34 (11th Cir. 1989).

II. <u>PLAINTIFF'S FMLA CLAIMS</u>

Defendant first argues that Plaintiff's FMLA claims are barred by the two-year statute of limitations set out at 29 U.S.C. § 2617(c). (Doc. 37 at 12.) Except for an action brought for a willful violation, an action must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). Plaintiff and Defendant both agree that the date of the last event constituting a violation was the date of Plaintiff's termination, February 23, 2011. Plaintiff, however, contends that her action is timely brought. Plaintiff filed an action in state court on February 25, 2013, and argues that, although the action was dismissed without prejudice on April 1, 2013, Plaintiff refiled this complaint on April 11, 2013 in federal court and Defendant had proper notice of Plaintiff's claims. (Doc. 42 at 7-8.) The Court notes that Plaintiff does not argue in her response brief that the three-year statute of limitations for willful violations applies. (Doc. 42 at 7-8.) Plaintiff appears to

be arguing that her initial complaint on February 25, 2013 was timely filed, and the second complaint on April 11, 2013, somehow relates back to the first filed complaint. The Court rejects this argument and finds that summary judgment is due to be granted to Defendant on Plaintiff's FMLA claims.

First, even if the state court action was timely filed, the Court finds that Georgia's renewal statute, O.C.G.A. § 9-2-61, does not save Plaintiff's instant complaint. " '[A] court looks to state law to define the time limitation applicable to a federal claim only when Congress has failed to provide a statute of limitations for a federal cause of action.' " Phillips v. United States, 260 F.3d 1316, 1318 (11th Cir. 2001) (quoting Pipkin v. United States Postal Serv., 951 F.2d 272, 275 (10th Cir. 1991)). In an unpublished opinion, the Eleventh Circuit has found that O.C.G.A. § 9-2-61 does not govern the renewal of a dismissed complaint where the plaintiff alleges violations of federal law that contain a specific statute of limitations. Miller v. Georgia, 223 F. App'x 842, 844 (11th Cir. 2007). In Miller, 223 F. App'x at 844, the plaintiff filed her initial complaint alleging violations of Title VII, the ADA, and the ADEA within the 90-day statute of limitations found under those provisions. The

complaint, however, was later dismissed for failure to perfect service. Id. at 845. The plaintiff then filed the federal complaint, well after the expiration of the 90-day period, and contended that O.C.G.A. § 9-2-61 governed the renewal of a dismissed complaint. Id. at 845. The Eleventh Circuit disagreed and found that, because Title VII, the ADA, and the ADEA all contain specific statute of limitations periods, which the plaintiff failed to satisfy, the Georgia renewal statute did not operate to save her claims. Id. Other circuit courts have similarly found that found that where a federal statute has its own statute of limitations, a state saving statute does not apply to expand that statute of limitations. See Rush v. Lock, 19 F. App'x 416, 418 (7th Cir. 2001) ("When a plaintiff brings a claim in federal court that is subject to a federal, rather than a state, statute of limitations, a state saving statute does not apply."); Smith v. Nationstar Mortg., LLC, 756 F. App'x 532, 534-35 (6th Cir. 2018) ("[W]e have invoked [Burnett v. New York Cent. R.R. Co., 380 U.S. 424, 433, 85 S. Ct. 1050, 1057, 13 L. Ed. 2d 941 (1965)] repeatedly when determining whether to apply state savings statutes to other federal laws, noting that when a claim is based on a federal law that has its own statute of limitations, it is straightforward that those limitations

14

control." (internal quotation marks and citations omitted)). Here, the FMLA has a specific statute of limitations in place. See 29 U.S.C. § 2617(c). Accordingly, the Court finds that Georgia's saving statute does not apply to expand the clearly set statute of limitations.

Additionally, the Court finds that the statute of limitations has not been tolled. First, it is clear that, in the Eleventh Circuit, "the filing of a complaint that was later dismissed without prejudice does not automatically toll the limitations period for a future complaint." Miller, 223 F. App'x at 845 (citing Bost v. Fed. Express Corp., 372 F.3d 1233, 1242 (11th Cir. 2004); Justice v. United States, 6 F.3d 1474, 1478-79 (11th Cir. 1993)). See also Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982). Second, the Court notes that Plaintiff has not argued that the statute of limitations should be equitably tolled. It is the plaintiff's duty to establish that tolling is warranted, Bost, 372 F.3d at 1242, and Plaintiff has not made any arguments in this case as to why this Court should equitably toll the statute of limitations. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's FMLA claims is **GRANTED.**

## III. PLAINTIFF'S ADA DISCRIMINATION CLAIM

The ADA prohibits a covered employer from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112. In the absence of direct evidence, Plaintiff must establish a prima facie case of disability discrimination utilizing the familiar burden shifting framework found in McDonnell Douglas v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973). Woodruff v. Sch. Bd. of Seminole Cty., Fla., 304 F. App'x 795, 797 (11th Cir. 2008). Under this framework, Plaintiff must first make out a prima facie case by showing that she (1) has a disability; (2) is a qualified individual under the ADA; and (3) was subjected to unlawful discrimination because of the disability. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255-56 (11th Cir. 2007). Should Plaintiff establish a prima facie case, Defendant then bears the burden of producing a legitimate, non-discriminatory reason for the adverse action. Woodruff, 304 F. App'x at 797 (citing to Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004)). If Defendant meets this burden, Plaintiff must then point to evidence that the proffered reason is merely pretextual. Id.

Defendant contends that it is entitled to summary judgment on any claim of discrimination under the ADA because Plaintiff was not a qualified individual with a disability under the ADA. (Doc. 37 at 17.) In the alternative, if Plaintiff was a qualified individual, Defendant argues that it is still entitled to summary judgment because Plaintiff cannot establish the third element of her prima facie case of discrimination (Id. at 19-20) and because Plaintiff cannot rebut the legitimate, non-discriminatory reasons for termination (Id. at 20-21).

Taking the second prong of the prima facie case, the Court finds that Plaintiff has not shown that she is or was a qualified individual under the ADA. To show she is a qualified individual, a plaintiff must show that she can perform the essential functions of the employment position she holds with or without reasonable accommodations. Salem v. City of Port St. Lucie, No. 18-14923, 2019 WL 4942237, at *1 (11th Cir. Oct. 8, 2019) (citing Holly, 492 F.3d at 1255-56). An accommodation is reasonable and necessary under the ADA only if it will enable the employee to perform the essential functions of the job. Id. "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually

required to perform." Holly, 492 F.3d at 1257 (internal

citation and quotation marks omitted).

> Whether a function of a position is
> essential is evaluated on a case-by-
> case basis by examining a number of
> factors, including the employer's
> judgment of what it believes to be the
> essential functions, any written
> description of the position, the amount
> of time spent on the job performing the
> function, and the consequences of not
> requiring the employee to perform the
> function.

Williams v. Revco Disc. Drug Centers, Inc., 552 F. App'x

919, 921 (11th Cir. 2014) (citing D'Angelo v. ConAgra

Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005)). "If the

individual is unable to perform an essential function of

his job, even with an accommodation, he is, by definition,

not a 'qualified individual' and, therefore, not covered

under the ADA. In other words, the ADA does not require the

employer to eliminate an essential function of the

plaintiff's job." Holly, 492 F.3d at 1256 (internal

citation and quotation marks omitted).

In support of its contention that Plaintiff is not a

qualified individual, Defendant points to Plaintiff's

deposition testimony in which Plaintiff states that heavy

lifting, driving a vehicle, and repetitive motions were

essential functions of her job. (Doc. 37 at 19.)

Additionally, Defendant highlights the fact that Plaintiff,

at least as of the date of her deposition, could not perform the essential functions of the job with or without reasonable accommodations. (Id.) In response, Plaintiff states that "Defendants did not take appropriate steps to ensure that Plaintiff was accommodated and failed to offer appropriate services to assist Plaintiff. Plaintiff was doing her job with the restrictions until Defendant stopped accommodating her and forced her to take her FMLA and denied her leave without pay." (Doc. 42 at 10-11.)

The Court finds that Plaintiff was not a qualified individual under the ADA. According to Plaintiff, the job of lab analyst included "a lot of heavy lifting" with all three sections involving lifting. (Doc. 37, Attach. 1 at 5; 6.) The position also required analysts to go out and collect samples on certain days of the week, which required driving and lifting the samples. (Id. at 5.) Plaintiff also stated that it was important for the analysts to switch between the three sections of the lab. (Id. at 6.) Moreover, Plaintiff further acknowledged that heavy lifting had to be performed in the job and that, if she was unable to do it, the other lab analysts had to perform these functions. (Id. at 12 ("If I don't do it, other people have to do it. It has to be done. There's no going around it. And if I'm hurt and I can't do it, then other analysts

would have to do it.").) Therefore, Plaintiff acknowledges that lifting, including heavy lifting, repetitive movements, and the ability to operate a vehicle are essential functions of the position she held while employed by Defendant. (Doc. 37, Attach. 1 at 4-6.) Taking into account the nature of the position, the duties and responsibilities performed by lab analysts, and the consequences of Plaintiff not being able to perform these duties, the Court finds that Plaintiff's restrictions, e.g. lifting, operating heavy machinery, and repetitive movements, are essential functions of the position.

Plaintiff must demonstrate that she could perform the essential functions of the job with or without reasonable accommodations. It is Plaintiff's duty to identify a reasonable accommodation that would allow her to perform the job, and an employer is not obligated to accommodate an employee in any manner in which the employee desires. Williams, 552 F. App'x at 921-22. The Court finds that Plaintiff has failed to show that she could perform the essential functions of the job with or without reasonable accommodations.

First, in her response brief, Plaintiff appears to generally argue that she was performing the job with the accommodations and restrictions in place until Defendant

stopped accommodating her. (Doc. 42 at 11.) The accommodations that Plaintiff references appears to be the restrictions placed on her returning to work by Ms. Widener. The return to work status form completed by Ms. Widener restricted Plaintiff from lifting and "while attending PT (physical therapy) no driving heavy equipment." (Doc. 37, Attach. 1 at 40.) However, as discussed above, these are essential functions of the position. Under the ADA, an employer is not required to accommodate an employee by eliminating the essential functions of the job. Williams, 552 F. App'x at 922 ("Nor does the ADA require an employer to eliminate an essential function of an employee's job or reallocate job duties to change the essential functions of a job." (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001); Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000)); Carroll v. City of Stone Mountain, 544 F. App'x 926, 928 (11th Cir. 2013) (noting that the ADA does not cover those who cannot perform the essential functions of their jobs presently or in the immediate future). Thus, Defendant was not required to allocate these duties to the other lab analysts to accommodate Plaintiff. See Williams, 552 F. App'x at 922 (finding that the ADA did not require the employer, CVS, to permanently provide the employee with

fulltime technical support because this would require the employer to eliminate essential functions of the pharmacist job and reallocate those functions to other employees); Tetteh v. Waff Television, 638 F. App'x 986, 988 (11th Cir. 2016) (finding that the ADA does not require an employer to reallocate job duties and, therefore, the employer was not required to have another photographer accompany the employee on her assignments while she was recovering from her injuries).

The only other possible accommodation that Plaintiff identifies is transferring her to another position. However, in her deposition, Plaintiff was unable to identify an open position to which she requested to be transferred as an accommodation. (See Doc. 37, Attach. 1 at 26.) Thus, while Plaintiff made general inquiries to Lloyd about transfers, Plaintiff does not recall ever applying to an open position after February 25, 2010 or specifically requesting to be transferred to an open position. (Id.) While reassignment may be a valid accommodation under the ADA, the ADA does not require an employer to transfer an employee to a position for which there is no vacancy or "bump another employee from a position in order to accommodate a disabled employee." Lucas, 257 F.3d at 1256. Indeed, 42 U.S.C. § 12111(9) defines the term "reasonable

accommodation" to include "reassignment to a **vacant** position." (emphasis added). Plaintiff has not shown that there was an open position that she applied for, much less that she was denied a transfer to the open position. Plaintiff, therefore, has not shown that a transfer was a reasonable accommodation.

Finally, the Court notes that Plaintiff, in her deposition, admitted that there was not an accommodation that could have been given to her that would have permitted her to perform the essential functions of the position. (Doc. 37, Attach. 1 at 26-27 ("Q: But the accommodations they provided, you weren't doing your full job, were you? A: No, not when I can't drive around town, and, you know, I wasn't well. I couldn't do those essential functions of the lab analyst position-.").) Additionally, during Plaintiff's deposition, the following exchange occurred:

> Q. Before your employment ended with the City, was there anything—after your ganglion cyst injury and before your employment ended, during that period of time, between February 2010 and February of 2011, was there anything that the City could have done to accommodate you which would have allowed you to perform all of the essential functions of your job as lab analyst?
> A. I don't know what all they could have done.

> Q.   Sitting here today can you tell me
>      anything they could have done?
> A.   If I couldn't do it in the
>      laboratory, they needed to
>      transfer me. I asked them about
>      transferring me.

(Id. at 27.) Therefore, as discussed, Plaintiff has not shown that she could perform the essential job functions with or without reasonable accommodations. Accordingly, the Court finds that Plaintiff is not a qualified individual under the ADA. As a result, Defendant's Motion for Summary Judgment as to Plaintiff's ADA discrimination claim is **GRANTED**.

## IV.   PLAINTIFF'S ADA RETALIATION CLAIM

In its Motion for Summary Judgment, Defendant argues that Plaintiff's ADA retaliation claim must be dismissed because Plaintiff failed to exhaust her administrative remedies before the EEOC, because the retaliation claim is duplicative of the discrimination claim, and because Plaintiff has failed to rebut Defendant's legitimate, non-retaliatory reason for terminating Plaintiff. (Id. at 20-25.) Defendant also argues that, in the event that the ADA retaliation claim survives, any claim for monetary damages must be dismissed. (Id. at 25.) In response, Plaintiff contends that her charge of discrimination with the EEOC included a claim for retaliation, that her retaliation

claim is not derivative of her discrimination claim, and that she can maintain a claim for monetary damages under the ADA for a retaliation claim. (Doc. 42 at 11-13.)

In regards to Defendant's exhaustion argument, the Court finds that Plaintiff has exhausted her administrative remedies as to the ADA retaliation claim. On Plaintiff's charge of discrimination with the EEOC, Plaintiff completed the section that requires boxes to be checked for what the alleged discrimination was based on and only selected the box labeled "DISABILITY." (Doc. 37, Attach. 1 at 56.) Plaintiff claims that, while she did not select the box labeled "RETALIATION," she alleged retaliation as one of her claims. (Doc. 42 at 11.) In the box asking for the "particulars" of the charge of discrimination, Plaintiff stated that she had requested a transfer to another department from January 2011 through February 2011 as a reasonable accommodation for the lifting restrictions, that she was informed on January 14, 2011 of her FMLA leave balance, that she completed a leave request under the FMLA, subsequently requested leave without pay for the period of February 14, 2011 through March 15, 2011 and was then discharged on February 23, 2011. (Doc. 37, Attach. 1 at 56.) In the next paragraph, Plaintiff stated that Mr. Tucker told her to apply for FMLA leave until she was

completely released for work, that Lloyd told her that he did not want to transfer her because he liked her work, and that Lloyd told her "that [she] was discharged because [her] leave under the FMLA had exhausted and that [her] special request for leave without pay was denied." (Id.) Plaintiff concludes the "particulars" section with the statement that "I believe that I have been discriminated against because of being perceived as an individual with a disability . . . ." (Id. at 57.)

The Court does not find the fact that Plaintiff did not check the box for retaliation dispositive. In Batson v. Salvation Army, 897 F.3d 1320, 1327-28 (11th Cir. 2018), the Eleventh Circuit noted that it had earlier found that the fact that the plaintiff had not checked the box for retaliation was not the dispositive question in whether the plaintiff had exhausted her administrative remedies. The Eleventh Circuit stated that "although the plaintiff had not checked the retaliation box on the document she filed with the EEOC, 'the exhaustion requirement was nonetheless satisfied' because the EEOC's 'investigation . . . would have reasonably uncovered any evidence of retaliation.' " Batson, 897 F.3d at 1327-28 (quoting Gregory v. Georgia Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir. 2004). The proper inquiry, therefore, is "whether the

'[plaintiff's] complaint [is] like or related to, or grew out of, the allegations contained in [the] EEOC charge.' " Id. (quoting Gregory, 355 F.3d at 1280). The Eleventh Circuit found that the plaintiff in Batson exhausted her administrative remedies because she included facts supporting her ADA accommodation claim in the charge of discrimination that were like or related to her retaliation claim. Id. at 1328.

The Court finds that Plaintiff has exhausted her administrative remedies with regard to the ADA retaliation charge. Plaintiff stated that she believed she suffered discrimination because she requested an accommodation, e.g. a transfer to another department, was not permitted that transfer, and was terminated after taking FMLA leave. Like in Batson, the charge of discrimination is sufficiently "related to" Plaintiff's retaliation claim to satisfy the exhaustion requirement. 897 F.3d at 1328. An EEOC investigation of Plaintiff's claim that she was terminated due to her disability would have reasonably uncovered any evidence of retaliation. See Gregory, 355 F.3d at 1280 (noting that the plaintiff's EEOC charge could have reasonably been extended to encompass a claim for retaliation because it was "inextricably intertwined" with the plaintiff's complaints of sex and race discrimination).

Defendant also contends that it is entitled to summary judgment on Plaintiff's ADA retaliation claim because the claim is duplicative of Plaintiff's ADA discrimination claim, which is subject to dismissal. (Doc. 37 at 22.) Specifically, Defendant argues that Plaintiff relies on the same facts and alleged actions by Defendant for both the discrimination and retaliation claims. (Id. at 22-23.) In response, Plaintiff contends that the two claims are distinct—"[f]irst, Plaintiff was discriminated against because Defendant no longer felt the need to accommodate her disability. She was then forced to use her FMLA. Second, when Plaintiff used all her available leave and went through the motions of asking for unpaid leave and was denied, she was terminated." (Doc. 42 at 12.) The termination is the basis for the retaliation claim. (Id.) It appears, therefore, that in her response, Plaintiff contends that she was retaliated against by being terminated for taking all of her FMLA leave and then requesting an additional unpaid period of leave. This framework diverges somewhat from Plaintiff's complaint.

In her complaint, Plaintiff claims that Defendant "retaliated against [her] for exercising her rights under the ADA to request accommodations for her disability by forcing her to take FMLA leave and then terminating her

when she requested to return to work with accommodations."
(Doc. 1 at 10.) To the extent that Plaintiff is claiming
she was retaliated against by Defendant refusing to
accommodate her and refusing to engage in an interactive
process, these claims are duplicative of her discrimination
claim, which has been rejected. Lucas, 257 F.3d at 1261. As
noted above, Plaintiff now appears to be contending that
she was retaliated against by being terminated after taking
FMLA leave and requesting additional unpaid leave, which
was denied. (Doc. 42 at 12.)

In order to establish a prima facie case of
retaliation, Plaintiff must show that: (1) she engaged in a
statutorily protected expression; (2) she suffered an
adverse employment action; and (3) there was a causal link
between the adverse action and her protected expression.
Lucas, 257 F.3d at 1260. Where, as here, an employee
alleges retaliation under the ADA without direct evidence
of the employer's intent, this Court applies the burden
shifting framework established in McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668
(1973). Batson, 897 F.3d at 1328-29. Once the plaintiff has
made out a prima facie case, the burden shifts to the
employer to articulate a non-discriminatory reason for the
adverse action. Id. If the employer does so, "the burden

29

shifts back to the employee to demonstrate that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. (internal quotation marks and citation omitted).

Assuming Plaintiff made out a prima facie case of retaliation under the ADA, the Court finds that Plaintiff has failed to rebut Defendant's legitimate, non-retaliatory reasons for termination. Defendant maintains that Plaintiff's employment was terminated because Plaintiff had no leave left and was unable to perform the essential functions of her job at the end of her FMLA leave. (Doc. 37 at 24.) An employer does not violate the ADA by terminating an employee who fails to return to work after expiration of her FMLA leave or otherwise terminating an employee for failing to submit a medical release upon returning to work. Neal v. T-Mobile USA, Inc., No. 1:15-CV-0210-TWT-JSA, 2016 WL 4492837, at *16 (N.D. Ga. Aug. 1, 2016), report and recommendation adopted, No. 1:15-CV-210-TWT, 2016 WL 4479497 (N.D. Ga. Aug. 25, 2016), aff'd, 700 F. App'x 888 (11th Cir. 2017); Diaz v. Transatlantic Bank, 367 F. App'x 93, 97 (11th Cir. 2010) (affirming district court's grant of summary judgment to the defendant on plaintiff's ADA and

FMLA claims of retaliation where the employer terminated the plaintiff because she failed to obtain medical clearance to return to work at the end of her FMLA leave); Roddy v. City of Villa Rica, Ga., 536 F. App'x 995, 1002 (11th Cir. 2013) (affirming the district court's grant of summary judgment to the defendant because plaintiff failed to establish that the legitimate reason proffered by the defendant for termination, that plaintiff could not physically return to work after his leave period, was pretextual).

In this case, the record shows that Plaintiff was permitted to take all of her FMLA leave and then, at the expiration of that leave, requested an additional thirty-day period of leave without pay, which was denied. (Doc. 37, Attach. 1 at 29.) Plaintiff, in her deposition, acknowledged that she did not know if she could perform the essential functions of her job at the conclusion of her FMLA leave. (Id.) Accordingly, Defendant has offered a legitimate, non-retaliatory reason for termination. Plaintiff has not offered any reason or argument that Defendant's proffered reason for termination was mere pretext for retaliation for taking and/or requesting medical leave, whether under the FMLA or otherwise. Plaintiff has not shown, or argued, that she was able to

31

return to work at the conclusion of her FMLA leave after her request for leave without pay was denied or that she could perform the essential functions of her job. Although Defendant specifically raises the argument that Plaintiff cannot show pretext, Plaintiff does not address this argument in her response brief. (See Doc. 42 at 11-13 (arguing that Plaintiff exhausted her administrative remedies on her ADA retaliation claim, that the retaliation claim is not duplicative of her ADA discrimination claim, and, finally, that Plaintiff has a valid claim for damages on the ADA retaliation claim).)

Even looking to other sections of her response brief, Plaintiff does not clearly argue how Defendant's proffered reason for termination was pretext. For example, in her response brief regarding her FMLA retaliation claim, which offers slightly more argument than the section addressing her ADA retaliation claim, Plaintiff contends that her "termination was a clear result of her requesting accommodation on the job but being denied." As discussed above in regards to whether Plaintiff was a qualified individual under the ADA, Plaintiff has not shown that there was any accommodation that would have permitted her to perform the essential functions of the job. In essence, Plaintiff contends that Defendant should have continued to

allow her to work with her restrictions, thereby removing the essential functions of her job or otherwise placing those job duties that she could not perform on the other lab analysts. The ADA does not require such accommodations by an employer. <u>Williams</u>, 552 F. App'x at 922 ("Nor does the ADA require an employer to eliminate an essential function of an employee's job or reallocate job duties to change the essential functions of a job."); <u>Lucas</u>, 257 F.3d at 1260. Accordingly, the Court finds that Plaintiff has failed to rebut the legitimate, non-retaliatory reason for termination. As a result, Defendant's Motion for Summary Judgment as to Plaintiff's ADA retaliation claim is **GRANTED.**

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 37) is **GRANTED.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this **21ST** day of November 2019.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA